UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

ROBERT T. STOOKSBURY, JR.,              )
                                        )
            Plaintiff,                  )
                                        )
v.                                      )      No.:   3:09-CV-498
                                        )             (VARLAN/GUYTON)
MICHAEL L. ROSS, *et al.*,              )
                                        )
            Defendants.                 )


## MEMORANDUM OPINION

This civil action is before the Court on the following motions: the Motion to Dismiss

filed by Michael L. Ross, LTR Properties, Inc., RPL Properties, Inc., LC Development

Company, LLC, Rarity Communities, Inc., Tellico Lake Properties, L.P., Rarity management

Company, LLC, Tellico Communities, Inc., Nickajack Shores Holdings, LLC, Rarity

Corporation, Rarity Club Corporation, Rarity Property Management, Inc., Rarity Ridge Club,

Inc., Rarity Investment Company, LLC, Pine Mountain Properties, LLC, Broadberry

Development Company, LLC, Hiwassee Properties, LLC, RM Company, LLC, LOM

Development Company, LLC, and VPI Company, LLC (the "Ross entities") [Doc. 85];[1] the

---

[1] A preliminary issue regarding defendants' motion is the fact that three of these defendants filed bankruptcy petitions after plaintiff commenced this action: VPI Company, LLC, Pine Mountain, LLC, and Nickajack Shores Holdings, LLC. Under § 362 of the Bankruptcy Code, a bankruptcy petition "operates as a stay" of, among other things, the continuation of a judicial proceeding against the debtor that was or could have been commenced before the commencement of the bankruptcy proceeding. 11 U.S.C. § 362(a)(1). Accordingly, this case has been stayed as to these three defendants [*See* Doc. 118]. And, because actions taken in violation of the stay are invalid and voidable and shall be voided absent limited equitable circumstance pursuant to Sixth Circuit law, *see Easley v. Pettibone Mich. Corp.*, 990 F.2d 905 (6th Cir. 1993), the Court will make no order with respect to these defendants. This case will continue to be stayed as to them.

Motion to Dismiss by Gregory Baker Based on Failure to State a Claim [Doc. 87]; and the

Motion to Dismiss by Defendants, Patricia Ross, Personal Representative of the Estate of

Dale M. Ross, Rebecca Rose Ross Jordan, and Rarity Management Company, LLC for

Failure to State a Claim [Doc. 88]. Plaintiff has filed a consolidated response in opposition

to the motions to dismiss [Doc. 102].[2] The motions to dismiss are ripe for the Court's

consideration.

I.      **Background**

Plaintiff Robert T. Stooksbury, Jr. commenced this action on or about November 18,

2009 [Doc. 1]. After receiving leave from the Court, plaintiff filed an amended complaint

[Doc. 73]. Pursuant to an order of the Court [Doc. 72], plaintiff also filed a Civil RICO

Statement [Doc. 74],[3] which he later amended [Doc. 77].

In the amended complaint, plaintiff alleges as that, in the mid-1990s, defendant

Michael Ross and his brother, Dale Ross (Michael Ross and Dale Ross, together, "the Ross

brothers"), got into the real estate business [Doc. 73, ¶ 20]. In or around 1998, they

established Rarity Communities, Inc., a Tennessee corporation, as 50-50 owners [*Id.*].

Through Rarity Communities, Inc., and through other related business entities they created

---

[2]Plaintiff's consolidated response also responds to the motion to dismiss filed by defendant Tracy Riedl [Doc. 89]. In light of the Court's April 12, 2011 order [Doc. 134], however, the Court does not address such motion herein.

[3]The Court's order explained that it is the practice of the Eastern District of Tennessee to require parties filing civil RICO claims to file a "Civil RICO Statement." *See Anderson v. Thompson*, No. 1:07-CV-100, 2007 WL 1490596, at *1 (E.D. Tenn. May 21, 2007).

and formed, the Ross brothers developed and marketed a waterfront community known as Rarity Bay [*Id.*].

In 2001, Michael Ross, through LTR Properties, Inc. ("LTR Properties")—an entity owned solely by Michael Ross—purchased a controlling interest in another waterfront property [*Id.*, ¶ 21]. This piece of property was previously owned by plaintiff and by Mr. Ward Whelchel [*Id.*]. An entity called Tellico Landing, LLC ("Tellico") was formed for the purpose of developing and marketing this piece of property, which ultimately was called "Rarity Pointe" [*Id.*]. By the terms of the agreement governing the sale of this piece of property, Michael Ross, through LTR Properties, acquired a controlling interest in Tellico as well as a fifty percent ownership interest in Tellico [*Id.*]. Michael Ross, through LTR Properties, also was given managerial control over the property's development, and was permitted to charge certain development fees for performing that management function [*Id.*]. Plaintiff and Mr. Whelchel each obtained a twenty-five percent ownership interest in Tellico [*Id.*].

In addition to forming entities to operate each of the Rarity developments, Michael Ross formed and used other business entities that he and/or Dale Ross owned and controlled to manage specific functions—like sales and marketing—for all of the Rarity developments [*Id.*, ¶ 22]. This arrangement permitted Michael Ross to control "virtually all" of the sales and marketing efforts for the Rarity developments through the entities he owned and controlled [*Id.*].

During their initial years of operation, both Rarity Bay and Rarity Pointe generated significant cash flow [*Id.*, ¶ 23]. But plaintiff alleges that, as significant cash flow was generated, the Ross brothers "began to operate the developments in a fast and loose manner" [*Id.*]. Plaintiff alleges that corners were cut; that funds intended for infrastructure and amenities at the developments were diverted for the personal benefit of the Ross brothers and of their relatives, associates, and agents; and that funds were diverted into other accounts to launch new projects [*Id.*].

In the mid-2000s, Michael Ross, through additional business entities he had formed, and in which he and Dale Ross had a financial and/or controlling ownership interest, started up several additional developments, including Rarity Meadows, Rarity Mountain, Rarity Ridge, and Rarity Club, allegedly for the purpose of perpetuating and expanding this diversion of funds [*Id.*]. According to plaintiff, the Rarity developments were "aggressively" marketed as having "top flight amenities" and sound finances [*Id.*, ¶ 24]. Plaintiff alleges, however, that the Ross brothers were in fact "systematically diverting large and improper portions of these developments' capital and cash flow for their personal use" "unbeknownst to lending institutions, property purchasers, investors, and individuals such as plaintiff" [*Id.*]. Plaintiff further alleges that Michael Ross was aware that funds from the proceeds of transactions at the various Rarity developments were being moved into other accounts and commingled in order to "shore up" various business transactions and to "bolster the books" of these various entities at various times [*Id.*, ¶ 28].

Plaintiff alleges involvement in these activities in various ways by the named defendants. Rebecca Rose Ross Jordan allegedly was the Director of Operations for one or more of the Rarity business entities; was directly involved in the operations of these entities; communicated directly with property purchasers and investors; and was aware of, and made, representations to property purchasers and investors regarding the status and future of amenities and infrastructure in the various Rarity developments [*Id.*, ¶ 30]. Greg Baker allegedly was, and is, the de facto chief financial officer of the Rarity business entities, and was personally aware of and facilitated the above-described commingling and diversion of funds [*Id.*, ¶ 31]. Fred McArthur allegedly was, and is, the de facto chief operations officer of the Rarity business entities, and was personally aware of and facilitated the above-described artificial inflation of property values [*Id.*, ¶ 32].

Plaintiff also alleges that Tracy Riedl was involved in the business dealings of the various Rarity developments [*Id.*, ¶ 33]. Ms. Riedl allegedly had actual and/or constructive knowledge of the above-described commingling and diversion of funds, and facilitated the above-described artificial inflation of property values, false appraisals, insider deals, and false documentation [*Id.*]. Ms. Riedl also was an officer and shareholder, along with Michael Ross, in a title company called Assurance Title Company, LLC ("Assurance Title") [*Id.*, ¶ 34]. This title company allegedly was formed for the purpose of enabling "virtually all" of the closings on sales at various Rarity developments to be conducted "in house," so that Michael Ross and Ms. Riedl could "easily monitor and control the manner in which the properties were valued and the closings were documented" [*Id.*]. Plaintiff alleges that,

because the office for Assurance Title was at all relevant times located within the same building as the various Rarity business entities, each of the principals involved in the Rarity developments was "intimately familiar" with what each was doing in furtherance of the activities described above [*Id.*, ¶ 35].

On the basis of these allegations—some of which are discussed in more detail *infra* Part III—plaintiff brings claims under the federal civil RICO statute,[4] as well as one state claim entitled "Breach of Agreement and Breach of Fiduciary Duties" [*Id.*, ¶¶ 37-115].

## II.     Standard of Review

Federal Rule of Civil Procedure 8(a) sets out a liberal pleading standard.  To survive a motion to dismiss, a pleading need contain only "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the [opposing party] fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  Detailed factual allegations are not required, but a party's "obligation to provide the 'grounds' of [its] 'entitle[ment] to relief' requires more than labels and conclusions."  *Twombly*, 550 U.S. at 555.  A formulaic recitation of the elements of a cause of action will not do.  *Id.*  Nor will an "unadorned, the-defendant-unlawfully harmed-me accusation."  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).  A pleading must instead "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Id.* (quoting *Twombly*, 550 U.S.

_____

[4]"RICO" is an acronym for the Racketeer Influenced and Corrupt Organizations Act.  *See* 18 U.S.C. §§ 1962, *et seq.*

at 570). "Determining whether a complaint states a plausible claim for relief will [ultimately] . . . be a context-specific task that requires th[is Court] to draw on its judicial experience and common sense." *Id.* at 1937.

## III.    Analysis

As all defendants rely solely upon the arguments set forth in the memorandum of law filed in support of the Ross entities' motion to dismiss, the following addresses the arguments made therein [*See* Docs. 85, 86, 87, 88].

### A.    Pattern of Racketeering Activity

RICO provides a private right of action for treble damages for "[a]ny person injured in his business or property by reason of a violation of [18 U.S.C. § 1962]." 18 U.S.C. § 1964(c). Plaintiff alleges violations of all four subparts of § 1962, which provides:

> (a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce . . . .

> (b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

> (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

18 U.S.C. § 1962.

Each of these subsections require "a pattern of racketeering."[5] To establish a "pattern of racketeering activity," plaintiff must sufficiently allege (1) at least two predicate acts of racketeering activity within a ten-year period constituting a pattern of (2) related and (3) continuous racketeering behavior. *Moon v. Harrison Piping Supply*, 465 F.3d 719, 723-24 (6th Cir. 2006). The alleged predicate acts may consist of offenses "which are indictable" under any of a number of federal statutes, including the mail and wire fraud and money laundering statutes. 18 U.S.C. § 1961(1). Defendants argue that plaintiff fails to state a claim because he fails to sufficiently allege (1) the existence of predicate acts of "racketeering activity" and (2) a "pattern" of such activity.

### 1.    Predicate Acts of Racketeering Activity

Defendants contend that plaintiff has failed to allege the existence of any "racketeering activity" as that term is defined under the RICO statute. Defendants argue that plaintiff instead attempts to rely upon violations of the Interstate Land Sales Act ("ILSA"), which cannot constitute "predicate acts" of racketeering activity under the RICO statute.

---

[5]The RICO offense under subsection (a) can be shown through a pattern of racketeering or "through the collection of an unlawful debt in which such person has participated as a principal." 18 U.S.C. § 1962(a). Plaintiffs do not allege the latter, so they must establish a pattern of racketeering to support their subsection (a) claim.

Defendants' argument is misplaced. Plaintiff's amended complaint refers to ILSA violations "as relevant evidence of the subject enterprise's purpose and the means by which it furthered its scheme, in addition to and not to the exclusion of the statutory predicate acts of racketeering" [*See* Doc. 102]. And, the amended complaint raises allegations of mail and wire fraud, and of money laundering, which can constitute predicate acts of racketeering activity under RICO.[6] The Court thus proceeds to consider defendants' related argument: even if plaintiff has successfully set forth allegations of mail and wire fraud, or of money laundering, those allegations are insufficiently plead.

### a.    Mail and Wire Fraud

Defendants contend that plaintiff has failed to allege his allegations of mail and wire fraud with sufficient particularity to withstand a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. The elements of mail and wire fraud are "(1) a scheme to defraud, and the (2) use of the mails, or of an interstate electronic communication, respectively, in furtherance of the scheme." *Advocacy Org. for Patients & Providers v. Auto Club Ins. Ass'n*, 176 F.3d 315, 322 (6th Cir. 1999). With respect to the first element, the Sixth Circuit has stated:

> A scheme to defraud consists of intentional fraud, consisting in deception intentionally practiced to induce another to part with property or to surrender some legal right, and which accomplishes the designed end. To allege

---

[6] "'[R]acketeering activity' means . . . any act which is indictable under" 18 U.S.C. § 1341 (relating to mail fraud), 18 U.S.C. § 1343 (relating to wire fraud), 18 U.S.C. § 1956 (relating to the laundering of monetary instruments), or 18 U.S.C. § 1957 (relating to engaging in monetary transactions in property derived from specified unlawful activity), among other indictable acts. *See* 18 U.S.C. § 1961(1).

intentional fraud, there must be proof of misrepresentations or omissions which were reasonably calculated to deceive persons of ordinary prudence and comprehension. Thus, the plaintiffs must allege with particularity a false statement of fact made by the defendant which the plaintiff relied on.

*Id.* (citation and emphasis omitted).[7]

"In alleging fraud . . . a party must state with particularity the circumstances constituting fraud . . . ." Fed. R. Civ. P. 9(b). "To satisfy Rule 9(b), a complaint of fraud, at a minimum, must allege the time, place, and content of the alleged misrepresentation . . . ; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *United States ex rel. Marlar v. BWXT Y-12, L.L.C.*, 525 F.3d 439, 444 (6th Cir. 2008) (internal quotations omitted). In addition, "[w]here a complaint alleges a complex and far-reaching fraudulent scheme," as is true in this case,[8] the scheme must be pleaded with particularity, and the complaint must include specific and representative examples of the allegedly fraudulent conduct. *Id.*

The Court notes that, "[i]n ruling upon a motion to dismiss under Rule 9(b) for failure to plead fraud 'with particularity,' a court must factor in the policy of simplicity in pleading

---

[7]Insofar as the alleged misrepresentations in this case are concerned, the Court notes that, while "it may well be that a RICO plaintiff alleging injury by reason of a pattern of mail fraud must establish at least third-party reliance in order to prove causation," "a plaintiff asserting a RICO claim predicated on mail fraud need not show, either as an element of its claim or as a prerequisite to establishing proximate causation, that it relied on the defendant's alleged misrepresentations." *Bridge v. Phoenix Bond & Indem. Co.*, 128 S. Ct. 2131, 2145 (2008); *Brown v. Cassens Transp. Co.*, 546 F.3d 347, 351 (6th Cir. 2008).

[8]Plaintiff contends that the allegations in the amended complaint "chronicle[] defendants' operation of what may be the largest illegal real estate business enterprise and conspiracy in the history of this Federal District, if not the State of Tennessee" [Doc. 102].

which the drafters of the Federal Rules codified in Rule 8." *Michaels Bldg. Co. v. Ameritrust Co., N.A.*, 848 F.2d 674, 679 (6th Cir. 1988). It is 'thus[] inappropriate to focus exclusively on the fact that Rule 9(b) requires particularity in pleading fraud." *Id.* Instead, Rules 8 and 9(b) "must be read in harmony." *Id.* What Rule 9(b) requires is not "omniscience; rather, the Rule requires that the circumstances of the fraud be pled with enough specificity to put defendants on notice as to the nature of the claim." *Id.* at 680.

The Court notes further that "courts have been reluctant to dismiss [an] action where the facts underlying the claims are within the defendant's control." *Id.* That is especially so when the parties have yet to conduct discovery.[9] *Id.* This rule is based in part on the "principle of basic fairness that a plaintiff should have an opportunity to flesh out her claim through evidence unturned in discovery." *Id.*

With respect to mail and wire fraud, plaintiff alleges that:

Defendants and employees and sales agents of the various Defendant Rarity business entities were engaging in a pattern and practice of illegal conduct calculated to inflate the property values artificially in the various Rarity developments. This type of conduct included, but was not limited to: (a) generating false sale and closing documents; (b) engaging in insider deals and sham transactions; and (c) engaging in improper rebate schemes, all of which were designed to cause investors to pay and lending institutions to loan artificially high amounts of money for property in the various Rarity developments. Said conduct, along with the other conduct described herein, was committed on a regular and consistent basis between January 1, 2004, and June 30, 2009, and comprised a significant part of the pattern of predicate acts committed during the operation of the subject illegal real estate enterprise and conspiracy.

---

[9]Plaintiff avers that "no discovery has taken place at this stage in the litigation" [Doc. 102].

As part of the illegal real estate enterprise and conspiracy . . . property was purchased, marketed and sold in various Rarity developments, including but not limited to the time period between January 1, 2004, through June 30, 2009, based in significant part on material and false representations regarding: (a) the nature and quality of the developments and their amenities; (b) the value of the individual lots in the developments; and (c) the overall value of the developments themselves.

The[se] material and false representations . . . were made by various salespersons, employees and agents of the Defendant Rarity business entities with the actual or constructive knowledge of the Defendants for the benefit of the Defendants. These material and false statements were made by said individuals regularly, repeatedly, and throughout the time period between January 1, 2004, and June 30, 2009 . . . .

. . . .

Examples of the material and false representations made during the referenced time period are statements contained in various marketing brochures regarding the nature, qualities and amenities of the various Rarity developments, such as those attached as Exhibits 1-7. Based upon information and belief, brochures such as these were mailed by Mike Ross, Greg Baker, Fred McArthur, and/or employees and sales agents at their direction and with their knowledge and consent through the United States mail to potential and actual purchasers and investors in other states, as well as in Tennessee, at various times each month between January 1, 2004, through June 30, 2009.

Similarly, HUD Statements of Record were mailed to agents of the United States government through the United States mail for the various Rarity developments annually between 2004 and 2009 which contained material and false statements regarding the nature and quality of the amenities at the Rarity developments, regarding the financial status of the developments, and regarding the nature and status of the developers of said projects. Such material and false statements were made in said HUD Statements of Record by Mike Ross in furtherance of the illegal enterprise and conspiracy referenced herein. An example of such HUD reports is hereto attached as Exhibit 8.

Further, throughout the time period lots were being sold at the various Rarity developments, including but not limited to the time period between January 1, 2004, and June 30, 2009, the Defendants, through several individuals who were acting for their collective benefit in furtherance of the illegal enterprise

and conspiracy described herein, including but not limited to Mike Ross, Tracy Riedl, and various sales agents acting at their direction, regularly and repeatedly made material and false statements on sale and closing documents regarding the value of the lots being sold. Said individuals engaged in a pattern and practice of making such material and false statements regarding property values during said time period for the purpose of artificially inflating property values for the financial benefit of the Defendants herein. Purely as an example of what constitutes a large number of such false statements over the referenced time period is contained in the documents hereto attached as collective Exhibit 9, which consists of true copies of the Warranty Deeds in the referenced 2004 transactions. Those documents reflect that property value at closing for these two lots together was initially stated to be approximately $700,000, then was crossed out and inflated to be $1,400,000 on the Warranty Deed. This inflated value was used to justify subsequent sales just a few months later, when one lot sold for a stated value of $600,000 and the other $800,000. Such false statements were frequently made and frequently included and re-stated in lists of property sales by Mike Ross, Tracy Riedl, Greg Baker, Fred McArthur, and/or various sales agents acting at their direction, which in turn were sent by said individuals to third parties through the United States mail and through fax machines for the purposes of: artificially inflating the property values of similar lots for future sales; artificially inflating the value of Rarity developments as a whole; attracting investors from out of state; and artificially inflating the financial statements of the Defendants herein. The conduct was calculated to induce investors to pay (and lenders to lend) artificially high amounts of money for property in the various Rarity developments. Based upon information and belief, sale and closing documents were altered by said Defendants for the benefit of and in furtherance of the subject illegal real estate enterprise and conspiracy on a periodic basis, several times per year, between January 1, 2004, and June 30, 2009.

. . . .

Plaintiff specifically pleads that contrary to the representations made regarding Rarity Pointe in the brochures and in the HUD Statements of Record referenced above and despite the millions of dollars generated in lot sales at Rarity Pointe through the summer of 2008, the true status of the amenities at Rarity Pointe, on account of the wrongful conduct of the Defendants described herein, by the summer of 2008 is reflected in the photographs hereto attached as collective Exhibit 12.

Mike Ross, Fred McArthur, and other principals involved with the Rarity developments repeatedly made false statements regarding Defendants' intentions to spend money on amenities at the various Rarity developments throughout the time period between January 1, 2004, and June 30, 2009. Said individuals repeatedly promised throughout that time period that the amenities would be completed soon, but simply had been delayed. These statements, as well as similar statements in the HUD Statements of Record, were material, false, and induced reliance on the part of various property owners, investors, lending institutions, and other individuals.

. . . .

Because of the manner in which the referenced illegal real estate business enterprise was conducted, lending institutions, property purchasers, investors, and individuals such as Plaintiff Rob Stooksbury were induced to invest and/or maintain significant amounts of money and resources in the respective developments, only to see significant portions of their investments misappropriated, converted, misused, and/or significantly devalued.

. . . .

[O]n account of Defendants' conduct as well as conduct of their agents and/or employees at the various Rarity entities, the following wrongful acts were committed by said individuals and entities with regard to Rarity Pointe during the time period between January 1, 2004, and June 30, 2009: (1) frequent misrepresentations were made in the sales brochures, correspondence to property purchasers, and in the HUD Statements of Reports which falsely portrayed the nature and quality of the amenities and the financial health of the projects; (2) a series of sham transactions were conducted based on insider deals between Mike Ross (and/or entities controlled by Mike Ross), Fred McArthur, and employees and agents of theirs, with the knowledge and consent of Tracy Riedl, Greg Baker, Dale Ross / the Estate of Dale Ross (through Patricia Ross and/or Rebecca Ross Jordan), and Rebecca Ross Jordan for the purpose of artificially inflating property values; (3) Mike Ross, with the knowledge and involvement of Greg Baker, changed the financing on the line of credit for the project and then converted funds and property of Tellico Landing, LLC's for other purposes, including but not limited to other Rarity projects and to pay themselves and their agents and sales associates; (4) lot sales totaling at least $1.5 million were shown as paying off the first mortgage to SunTrust Bank on the HUD Settlement Statements and posted to the SunTrust Line of Credit Account on the Tellico Landing general ledger,

although this money was in fact not applied to the principal of the Tellico Landing Line of Credit Account at SunTrust; (5) lot sales totaling at least $400,000 were shown as paying off the first mortgage to SunTrust Bank on the HUD Settlement Statements, yet this money was deposited into a cash account instead of applying it to the SunTrust Line of Credit Account; (6) Rarity Pointe lots were at times sold to insiders at a substantial discount as payments and/or to settle obligations Mike Ross and/or the Defendant Rarity business entities had to said insiders on account of their work involving other Rarity developments, after which the insiders would be allowed to flip the properties for higher amounts and keep the profits; (7) despite the project generating significant cash flow, because of the co-mingling and conversion of funds referenced above, corners were cut in management, such that Tennessee Department of Environment and Conservation (TDEC) regulations were violated, subjecting Tellico Landing, LLC to liability and expenses; (8) questionable lowered appraisals were evidently obtained for more than $11 million worth of properties on 2005 tax appraisals on account of a relationship with a local elected official; based upon information and belief, said elected official's son became an employee and/or sales agent for Mike Ross during that time period; (9) insiders who were agents of Mike Ross and/or entities controlled by Mike Ross entered into relationships with third parties to buy property within Rarity Pointe and re-sell it for a profit, sometimes in direct competition with open market buyers; (10) Mike Ross, himself and through entities controlled by Mike Ross and Dale Ross / the Estate of Dale Ross developed and marketed a condominium project for Rarity Pointe, a development project in direct competition with Tellico Landing's real estate development project and, after it failed, diverted millions of dollars in funds allegedly to pay for expenses relating to the condominium project; (11) on account of the wrongful conduct which was committed by or which is attributable to the Defendants, there was unreasonable delay in the construction of amenities, which never have been constructed near a standard consistent with representations made to purchasers; (12) false price lists and false closing statements were provided to minority members through the mail, by fax and by wire, throughout the time period from January 1, 2004, through June 30, 2009; (13) in 2002, an initial Statement of Record for the subdivision named "Rarity Pointe" was filed with the U.S. Department of Housing and Urban Development ("HUD"), and in each of the subsequent years, through 2009, Amended Statements of Record and Annual Reports of Activity were filed with HUD which contained false and/or misleading statements concerning the status of amenities and the amount of indebtedness on the project; and (14) such statements were sent to HUD on behalf of Defendant Mike Ross and/or Defendant entities controlled by Mike Ross and Dale Ross

/ the Estate of Dale Ross and are alleged to have been communicated to HUD through the U.S. mail system.

. . . .

Based upon information and belief, incomplete, improper, and evasive federal income tax returns and schedules were sent by and on behalf of Defendant Mike Ross, Dale Ross / the Estate of Dale Ross / Patricia Ross, and the Defendant Rarity business entities, with the assistance of Greg Baker, through the United States mail on an annual basis from 2004 through the present.

Based upon information and belief, HUD filings which contained materially false and/or misleading statements concerning the status of amenities and the amount of indebtedness which had been paid down were sent through the U.S. mail system on behalf of Defendant Mike Ross and/or Defendant entities controlled by Mike Ross and Dale Ross / the Estate of Dale Ross to HUD concerning other Rarity Developments as well.

. . . .

As part of attempting to inflate the value of the Rarity developments, Defendants Mike Ross, Tracy Riedl, Greg Baker, and Fred McArthur and their employees and agents, through the entities owned and controlled by Mike Ross and/or Dale Ross / the Estate of Dale Ross (through Patricia Ross / Rebecca Ross Jordan), for their mutual benefit, committed and facilitated the schemes referenced above which were designed to inflate artificially the property values of the Rarity developments between January 1, 2004, and June 30, 2009; money or property was an object of those schemes; which used the United States mail and fax machines / wire on a regular basis during said time period in interstate commerce to further the scheme.

When Defendant Mike Ross, as managing member / owner of the various business entities named as Defendants herein, as well as controlling member of Tellico Landing, LLC, mailed and/or faxed the Annual Report of Activity and Amended Statements of Record for the various Rarity developments, including but not limited to Rarity Pointe, to the U.S. Department of Housing and Urban Development, Defendant Mike Ross was furthering a scheme to defraud; money or property was an object of that scheme; and he used mail and/or wire to further the scheme. This conduct was committed with the knowledge and/or consent of Dale Ross / the Estate of Dale Ross (through Patricia Ross / Rebecca Ross Jordan) for their mutual benefit and profit.

As part of attempting to inflate the value of the Rarity developments, Defendants Mike Ross, Greg Baker, and Fred McArthur and their employees and agents, through the entities owned and controlled by Mike Ross and/or Dale Ross / the Estate of Dale Ross (through Patricia Ross / Rebecca Ross Jordan), for their mutual benefit, made and caused to be made misleading and deceptive representations as aforesaid during the time period between January 1, 2004, and June 30, 2009, on a regular and repeated basis, as a way of doing business at the Rarity developments in order to inflate property values and induce interstate sales. Ultimately, this induced purchasers to buy property at prices that could not be sustained, such that the values ultimately crashed, which injured each of the Rarity developments, including Rarity Pointe, as well as those who had invested in those developments (including Mr. Stooksbury). Further, misleading statements were made during said time period by said individuals regarding the true statue of the financial stability of the Rarity developments, including but not limited to Rarity Pointe and including but not limited to the status of each project, the project's projected completion date, and the project's amenities.

[Doc. 73, ¶¶ 40, 41, 42, 44-46, 55, 56, 58, 74, 77, 78, 81, 82, 83].

Given these allegations, the Court finds that, in satisfaction of the elements required for mail or wire fraud, plaintiff has sufficiently pleaded allegations of a scheme to defraud and that the mails or interstate electronic communication were used in furtherance of the scheme.[10] Plaintiff also has pleaded reliance.

Additionally, in satisfaction of Rule 9(b), plaintiff specifically has set forth the time, place, and content of the misrepresentations made in this case, allegations of the scheme to defraud, and defendants' fraudulent intent. The Court also finds that plaintiff has provided "specific and representative examples" of fraudulent conduct.

---

[10]The Court notes that "innocent mailings–ones that contain no false information themselves–can still be sufficient to be a part of a mail fraud" as long as the mailings are at least "incident to an essential part of the scheme." *Dana Corp. v. Blue Cross & Blue Shield Mut.*, 900 F.2d 882, 886 (6th Cir. 1990).

Further, the Court finds that plaintiff has specifically set forth allegations of injury resulting from the alleged fraud in this case. Plaintiff alleges, for example, that:

> Because of the manner in which the referenced illegal real estate business enterprise was conducted, lending institutions, property purchasers, investors, and individuals such as plaintiff . . . were induced to invest and/or maintain significant amounts of money and resources in the respective developments, only to see significant portions of their investments misappropriated, converted, misused, and/or significantly devalued.
>
> . . . .
>
> Plaintiff's losses and injuries include, but are not limited to . . . lost income from the sale of properties within Rarity Pointe which were not reported or disclosed to [plaintiff] or to Mr. Whelchel; lost funds and profits which were hidden from [plaintiff] or Mr. Whelchel; lost funds and profits which were diverted by Mike Ross, Dale Ross, Greg Baker, and others for said individuals' own benefit or for use in other projects owned and controlled by Mike Ross and Dale Ross . . . in furtherance of the enterprise; lost profits on account of the insider sham transactions referenced above; and losses on account of the downward spiral of property values caused by the conduct referenced above.
>
> . . . .
>
> As a direct and proximate result of the wrongful and illegal conduct which was committed by and/or is attributable to the Defendants . . . [plaintiff] suffered significant financial losses, as literally millions of dollars were taken out of Tellico . . . and were used by Defendants for other purposes; as the property values in all of the Rarity developments, including Rarity Pointe, were devastated once the "bubble" burst which had been created by the fraudulent conduct of the Defendants which artificially inflated . . . property values . . . beyond the breaking point; and as the promised amenities in the Rarity developments, including Rarity Pointe, either were never built or were never built to the promised standard, though there would have been more than sufficient funds to do so, had the proceeds of the respective lot sales been used for those purposes instead of being converted, misappropriated, and misused by the Defendants.

Further, as a direct and proximate result of the wrongful and illegal conduct which was committed by and/or is attributable to the Defendants, [plaintiff] has suffered losses in the millions of dollars on account of the property of Tellico . . . being converted by Mike Ross, Greg Baker, Fred McArthur and entities owned and controlled by Mike Ross for their own purposes.

Additionally, as a direct and proximate result of the wrongful and illegal conduct which was committed by and/or is attributable to Defendants Mike Ross, LTR Properties . . . Greg Baker, and other Defendants, [plaintiff] has suffered damages in excess of five million dollars on account of funds being improperly and unnecessarily drawn down on the credit line of Tellico . . . with SunTrust Bank and on account of proceeds from property sales not being applied to reduce the principal amount of Tellico['s] . . . indebtedness, such that funds which should have been used to satisfy Tellico['s] . . . indebtedness in full were converted for other improper purposes . . . .

[Doc. 73, ¶¶ 58, 87, 116-18].

In light of the legal standards explained above, the Court finds that plaintiff has satisfied the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) with respect to his allegations of mail and wire fraud. Therefore, dismissal of the amended complaint for failure to state mail or wire fraud is inappropriate.

### b.    Money Laundering

Defendant argues that plaintiff makes a "cryptic" and "unsupported" allegation of money laundering "without setting forth any factual allegations whatsoever to make out even a prima facie case of any such claims" [Doc. 86]. Defendants further assert that the amended complaint fails to plead with particularity how defendants engaged in money laundering [*Id.*].

There are two types of money laundering: promotional money laundering, which is undertaken to promote illicit activity, and concealment money laundering, which is undertaken to conceal the origin of illicit funds. *United States v. Warshak*, 631 F.3d 266, 317

(6th Cir. 2010). The elements of promotional money laundering are that a person "(1) conducted a financial transaction that involved the proceeds of unlawful activity; (2) knew [that] the property involved was proceeds of unlawful activity; and (3) intended to promote that unlawful activity." *Id.* (citation omitted). The first two elements of concealment money laundering are the same as those of promotional money laundering, but the third element of concealment money laundering requires proof that a person knew "that the transaction [was] designed in whole or in part to disguise the . . . source, ownership, or control of the proceeds." *Id.* at 320-21.

The Court finds that, in satisfaction of the first two elements of money laundering, plaintiff has provided sufficient allegations that defendants conducted financial transactions that involved the proceeds of unlawful activity, and that defendants knew that the property involved was proceeds of unlawful activity. Plaintiff alleges, for example, that:

> [A] significant portion of the proceeds from the sale of lots in various Rarity developments . . . were improperly and wrongfully commingled in other accounts of entities owned and controlled by Mike Ross and Dale Ross . . . with the actual or constructive knowledge of Mike Ross and/or Dale Ross and with the direct participation of Greg Baker during throughout the time period from January 1, 2004, through June 30, 2009. Said co-mingling of funds was conducted as a matter of course during the referenced time period by Greg Baker and is alleged to have occurred during said time period regularly, repeatedly and generally on a monthly basis.

> [T]he proceeds of the various property sale transactions at the various Rarity developments referenced herein, including but not limited to . . . sham transactions . . . between insiders, were often treated as the personal funds of Mike Ross and Dale Ross . . . regardless of whether those funds had been pledged for other uses . . . .

Further, a methodical, deliberate pattern and practice of conducting regular and repeated insider sham transactions was conducted over a period of several years . . . in which Mike Ross, Tracy Riedl, Greg Baker, Dale Ross, Fred McArthur, and other agents, employees, and/or business entities owned and controlled by Mike Ross and Dale Ross . . . would "sell" lots in the various Rarity developments to one another and/or to entities owned and/or controlled by one another for the purpose and with the intention of: (i) artificially inflating the property values; (ii) enabling property purchasers to qualify for financing; (iii) generating lists of prior sales which would appear to represent high prior sales, high lot values, and, collectively, high values of the property as a whole in the respective developments, which in turn were designed to entice investors, including out of state investors, to purchase lots and memberships in the respective developments; (iv) generating an artificially high track record of sales performance and income for the purpose of enabling Mike Ross, Dale Ross / the Estate of Dale Ross, and the entities they controlled (including but not limited to the entities named as Defendants herein) to qualify for financing from federal lending institutions and for the purpose of preparing artificially inflated financial statements for various lending institutions, including federal banking institutions; and (v) enabling the overall revenue from the illegal enterprise and conspiracy to increase dramatically for the benefit of the Defendants herein. One such example of an insider transaction is the series of sales referenced in paragraph 46 above.

[Doc. 73, ¶¶ 47-49].[11]

The Court also finds that, in satisfaction of the final element of promotional money laundering, plaintiff has provided sufficient allegations that defendants intended to promote unlawful activity in undertaking these transactions. Plaintiff alleges, for example, that the "deliberate pattern and practice of conducting regular and repeated insider sham transactions" referenced above was undertaken:

[F]or the purpose and with the intention of: (i) artificially inflating . . . property values; (ii) enabling property purchasers to qualify for financing; (iii)

---

[11]Additional details of these alleged "sham transactions" can be found in paragraphs 50 through 54 of the amended complaint.

generating lists of prior sales which would appear to represent high prior sales, high lot values, and, collectively, high values of the property as a whole in the respective developments, which in turn were designed to entice investors, including out of state investors, to purchase lots and memberships in the respective developments; (iv) generating an artificially high track record of sales performance and income for the purpose of enabling Mike Ross, Dale Ross . . . and the entities they controlled . . . to qualify for financing from federal lending institutions and for the purpose of preparing artificially inflated financial statements for various lending institutions, including federal banking institutions; and (v) enabling the overall revenue from the illegal enterprise and conspiracy to increase dramatically for the benefit of the Defendants herein.

[Doc. 73, ¶ 49].  The Court thus finds that plaintiff has raised allegations of promotional money laundering sufficient to withstand a motion to dismiss.

The Court further finds that, in satisfaction of the final element of concealment money laundering, plaintiff has provided sufficient allegations that defendants knew that these transactions were designed in whole or in part to disguise the source, ownership, or control of the proceeds.  Plaintiff alleges, for example, that:

Defendants were systematically diverting large and improper portions of the[] developments' capital and cash flow for their personal use . . . .

. . . .

Mike Ross was aware that funds from the proceeds of transactions at the various Rarity developments were being moved into other accounts and commingled, both through a sweep account operated and controlled by Mike Ross and Greg Baker and through simply shifting funds between the various entities as necessary to shore up various business transactions and to bolster the books of the various entities at various times . . . .

Greg Baker was (and remains) the de facto chief financial officer of each of the Defendant Rarity business entities and was personally aware of and facilitated the commingling and diversion of funds referenced herein . . . .

. . . .

Fred McArthur was (and remains) the de facto chief operations officer of each of the Defendant Rarity business entities and was personally aware of and facilitated the artificial inflation of property values referenced herein.

. . . .

Tracy Riedl had actual and/or constructive knowledge of the commingling and diversion of funds referenced herein and facilitated the wrongful acts and omissions concerning the artificial inflation of property values, false appraisals, insider deals, and false documentation described herein.

[Doc. 73, ¶¶ 24, 28, 31-33]. The Court thus finds that plaintiff has raised allegations of concealment money laundering sufficient to withstand a motion to dismiss.[12]

The Court therefore rejects defendants' argument that plaintiff has failed to raise allegations of predicate acts sufficient to satisfy Federal Rule of Civil Procedure 12(b)(6).

## 2. Pattern of Racketeering Activity

Defendants argue that, even assuming that plaintiff has raised sufficient allegations of predicate acts of racketeering activity, plaintiff has nevertheless failed to raise allegations of a "pattern" of racketeering activity within the meaning of the RICO statute. "The pattern requirement of a RICO action is satisfied by showing (1) a relationship between the predicate acts and (2) the threat of continued activity." *Snowden v. Lexmark Int'l, Inc.*, 237 F.3d 620, 622 (6th Cir. 2001).

---

[12]The Court notes that some courts outside this Circuit have determined that Rule 9(b) does not apply with respect to the claim of money laundering. *See, e.g., Eastman Kodak Co. v. Camarata*, No. 05-cv-6384L, 2006 WL 3538944 (W.D.N.Y. Dec. 6, 2006). And, it does not appear from the Court's research that the Sixth Circuit has explicitly held that all allegations of money laundering must comport with Rule 9(b). Regardless, Rule 9(b) requires that any claim alleging fraud must be stated with particularity, and to the extent plaintiff's money laundering claim is based on allegations of fraud, Court finds that plaintiff pleads his allegations of money laundering with sufficient particularity pursuant to the standards explained herein. *See supra* Part III.A.1.b.

"A relationship among predicate acts is established when they 'have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.'" *Brown v. Cassens Transp. Co.*, 546 F.3d 347, 354 (6th Cir. 2008) (quoting *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 240 (1989)). The test for relatedness is a broad one. *Id.* at 354. "Continued activity," or "continuity," "can be shown 'by proving a series of related predicates extending over a substantial period of time.'" *Id.* (quoting *H.J. Inc.*, 492 U.S. at 240). "Continuity" is primarily a temporal concept. *Columbia Natural Res. v. Tatum*, 58 F.3d 1101, 1110 (6th Cir. 1995).

### a.    "Relationship"

The Court finds that the allegations in plaintiff's amended complaint suffice to establish a "relationship" among the predicate acts within the meaning of the RICO statute. The purposes of the alleged predicate acts—to market and sell property based upon material and false representations, and to commingle large sums of money into personal accounts in order to "shore up" the developments' books—were similar [*See* Doc. 73, ¶¶ 24, 31-33, 41, 42, 47, 48, 72]. The results of these acts—the alleged misappropriation, conversion, misuse, and devaluation of investments made by others—were similar [*See id.*, ¶¶ 58, 63, 72, 87]. The participants in these acts—colleagues working for the various entities named in the amended complaint—were similar [*See id.*, ¶¶ 27-35, 72]. The victims of these acts—the purchasers, lenders, and persons who unknowingly funded the enterprise's scheme—were similar [*See id.*, ¶¶ 63, 72, 87, 88]. And the methods of commission of the acts—the making

of fraudulent representations, and the omission of material facts with respect to the financial stability of the Rarity developments—also were similar [*See id.*, ¶¶ 72, 74].  The Court thus finds that the alleged predicate acts are "related" within the meaning of the RICO statute.

### b.    "Continuity"

Defendants contend that "[i]t is impossible to determine that there is any continuity among the alleged 'predicate acts' because no specific dates or actions (generally or with respect to each individual Defendant) have been pled by plaintiff" [Doc. 86].  Defendants' argument is misplaced.  Plaintiff's amended complaint alleges the existence of a complex conspiracy stretching from January 1, 2004 through June 30, 2009 [*Id.*, ¶ 19].  In doing so, the amended complaint makes reference to a large number of predicate acts undertaken to advance the conspiracy [*See id.*, ¶¶ 44-57].  The fact that the amended complaint does not provide the date and means of transmission for each and every allegedly false mailing, representation, fax, phone call, and bank transfer—to mention the components of a few of these related predicates—does not render these allegations too speculative to survive a motion to dismiss, particularly when much of this information is under defendants' control. *See Tatum*, 58 F.3d at 1110-11 (finding a pattern to be sufficiently pled where complaint "allege[d] a significant period of activity . . . of about nine years . . . list[ing] dozens of examples of . . . mail and wire fraud . . . [which] were the foundation for various schemes" to defraud, and which "resulted in various injuries"); *see also Michaels Bldg. Co.*, 848 F.2d at 681 (noting that the Court of Appeals is "reluctant to punish [a] plaintiff for [his] ignorance of a specific factual detail, as long as defendants have adequate notice of why they

are being sued and are capable of preparing a responsive pleading"). The Court thus finds that the alleged predicate acts are "continuous" within the meaning of the RICO statute.

Accordingly, because plaintiff has successfully alleged that the predicate acts set forth in the amended complaint are "related" and "continuous," the Court finds they thus constitute a pattern within the meaning of the RICO statute.

### B.      Proximate Cause

Defendants contend that the amended complaint fails to state a claim for relief because "it fails to allege *how* the alleged RICO violations caused injury to plaintiff" [Doc. 86]. Defendants further contend that, § 1962(b) requires the assertion of an injury that is independent from that caused by the racketeering activity, and that plaintiff fails to demonstrate he suffered injury from the defendants' acquisition or control of an interest in the alleged racketeering activities in addition to any injures he sustained from the alleged predicate acts [*Id*.].

A plaintiff asserting a § 1964(c) action must show that the RICO violation he alleges caused his injury. With respect to an alleged violation of § 1962(c), a plaintiff must allege that the defendant's violations of § 1962(c) led to the plaintiff's injuries. *Grange Mut. Cas. Co. v. Mack*, 290 F. App'x 832, 835 (6th Cir. 2008) (unpublished) (citing *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006)). "Both 'but for' and proximate cause are required." *Id.* at 835 (citing *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268-69 (1992)). The Supreme Court has defined proximate cause as "some direct relation between the injury asserted and the injurious conduct alleged." *Bridge*, 128 S. Ct. at 2142 (quoting *Holmes*, 503

U.S. at 268). In other words, a plaintiff's "injury must 'flow from the commission of the predicate acts' . . . . If no injury flowed from a particular predicate act, no recovery lies for the commission of that act." *Saro v. Brown*, 11 F. App'x 387, 389 (6th Cir. 2001) (unpublished) (citing *Holmes*, 503 U.S. at 265-68).

Construing the facts set forth in the amended complaint as true, the Court must disagree with defendants that plaintiff fails to allege causation with respect to plaintiff's § 1962(c) claim.[13] The Sixth Circuit has stated that a "plaintiff[] need not show that [a defendant's] conduct was the sole cause of [his] injury in order to establish proximate cause; [he] need show only that the conduct was a substantial cause." *Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 620 (6th Cir. 2004). In this case—and contrary to defendants' argument—plaintiff has specifically alleged how the RICO violations he has identified caused injury to him. Plaintiff alleges, for example, that:

> Because of the manner in which the referenced illegal real estate business enterprise was conducted, lending institutions, property purchasers, investors, and individuals such as plaintiff . . . were induced to invest and/or maintain significant amounts of money and resources in the respective [Rarity] developments, only to see significant portions of their investments misappropriated, converted, misused, and/or significantly devalued.
>
> . . . .

---

[13]The Court notes that proximate cause issues are more appropriately dealt with at the summary judgment stage than at the motion to dismiss stage. *See Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 615 (6th Cir. 2004) ("[C]ausal weaknesses will more often be fodder for a summary-judgment motion under Rule 56 than a motion to dismiss under Rule 12(b)(6).").

As a direct and proximate result of said wrongful and fraudulent conduct which was committed by and/or which is attributable to the Defendants herein, plaintiff . . . suffered economic damages and losses . . . .

. . . .

Plaintiff's losses and injuries include, but are not limited to . . . lost income from the sale of properties within Rarity Pointe which were not reported or disclosed to [plaintiff] or to Mr. Welchel; lost funds and profits which were hidden from [plaintiff] or Mr. Welchel; lost funds and profits which were diverted by Mike Ross, Dale Ross, Greg Baker, and others for said individuals' own benefit or for use in other projects owned and controlled by Mike Ross and Dale Ross . . . in furtherance of the enterprise; lost profits on account of the insider sham transactions referenced above; and losses on account of the downward spiral of property values caused by the conduct referenced above.

[Doc. 73, ¶¶ 58, 63, 87].[14]  These allegations meet the "direct causal connection" requirement "as no 'intricate, uncertain' inquiries are required to link the defendants' alleged fraud [and money laundering] and the plaintiff['s] injuries."  *Brown*, 546 F.3d at 357 (citing *Anza*, 547 U.S. at 460).[15]

To state a claim pursuant to § 1962(b), a plaintiff must plead an injury proximately caused by the acquisition of an interest in the targeted enterprise, not an injury from the alleged predicate acts.  *Advocacy Org. for Patients and Providers*, 176 F.3d at 329.  "The

---

[14]*See also supra* Part II.

[15]Defendants assert, pursuant solely to Second Circuit law, that plaintiff must demonstrate that he was the intended target of the RICO scheme [Doc. 86].  Although the Court recognizes such required in the Second Circuit, it does not appear that Sixth Circuit law requires such, and defendants fail to point this Court to any Sixth Circuit case law so requiring.  Even if such requirement existed in this Circuit, however, the Court would find that plaintiff was an intended target of the RICO scheme.  Indeed, defendants do not argue that plaintiff was not the intended target, and they fail to articulate who, instead of plaintiff, may have been the intended target.

civil remedy created by § 1964(c) authorizes recovery only for injury that a plaintiff suffers 'by reason of' the RICO violation; therefore a complaint for violation of § 1964(b) must allege an 'acquisition or maintenance' injury separate and apart from the injury suffered as a result of the predicate acts of racketeering activity." *Id.* (citation omitted).  As one court stated:

> [A]ccording to 18 U.S.C. § 1964(c), plaintiff can only seek a civil remedy under RICO if her business or property was injured by reason of the § 1962(b) violation.  Contrary to plaintiff's assertion, one does not violate § 1962(b) by committing mail fraud or extortion.  Instead, one must use racketeering activity to gain control or interest in an enterprise.  In other words, plaintiff cannot simply allege that she was injured by the underlying acts of mail fraud and extortion.  Rather, she must allege that she was injured by a violation of § 1962(b).  In this case, in order to be injured by a violation of § 1962(b), plaintiff must show that her alleged injuries resulted from Auto Club having maintained an interest in itself as an enterprise.

*Id.* (citing *Whaley v. Auto Club Ins. Assoc.*, 891 F. Supp 1237 (E.D. Mich. 1995), *aff'd*, 129 F.3d 1266 (6th Cir. 1997 (unpublished per curiam)).  "The classic example of a § 1962(b) injury is where the owner of a legitimate business is injured by infiltration of the business by racketeering activity such as loan sharking or extortion."  *Welch Foods, Inc. v. Packer*, No. 1:94-cv-814, 1996 WL 380700, at *3 (W.D. Mich. Jan. 8, 1996) (citing *F/V Robins Nest, Inc. v. Atlantic Marine Diesel, Inc.*, Nos. 92-3900, 1994 WL 594592, (D. N.J. Oct. 14, 1994)).

Here, only in boilerplate does plaintiff allege that he was injured by defendants' violations of § 1962(b).  Plaintiff does not allege an "acquisition or maintenance injury." Instead, plaintiff asserts that his losses were a result of defendants' acts of racketeering (*i.e.*,

money laundering and mail and wire fraud). Accordingly, plaintiff's § 1962(b) claim will be dismissed.

Similarly, to state a claim pursuant to § 1962(a), a plaintiff must demonstrate "that he was injured as a result of the investment of racketeering income." *Elkins v. Chapman*, 36 F. App'x 543, 544 (6th Cir. 2002) (unpublished) (citation omitted). Injury caused by the alleged racketeering activities themselves is insufficient. *See Vemco, Inc. v. Camardella*, 23 F.3d 129, 133 (6th Cir. 1994) (citing *Craighead v. E.F. Hutton & Co.*, 899 F.2d 485, 494 (6th Cir. 1990)). The Court finds that plaintiff has failed to establish this requirement because plaintiff, except in boilerplate fashion, does not allege that he was injured as a result of the investment of racketeering income. The substance of plaintiff's allegations, rather, is that he was injured as a result of defendants' racketeering activities (*i.e.*, money laundering and mail and wire fraud). Accordingly, plaintiff's § 1962(a) claim will be dismissed. *See Vemco*, 23 F.3d at 133 (dismissing § 1962(a) claim because plaintiff alleged only that "the income [the defendant] derived from its racketeering against [the plaintiff] was subsequently used to operate the enterprise" not that "the reinvestment into the enterprise resulted in an injury separate from the 'predicate acts' injuries").

## C.     Standing

Defendants also contend that plaintiff lacks standing to bring this case, but the Court disagrees. "Any person injured in his business or property by reason of a violation of [the RICO statute] may sue therefor in any appropriate United States district court." 18 U.S.C. § 1964(c). Plaintiff is a person, and has alleged injury to his property as well as that he has

suffered this injury by reason of violations of the RICO statute. *See* discussion *supra* Part III.A. and Part III.B. Plaintiff therefore has standing to bring this suit.

**D.     Defendants' Remaining Arguments**

The Court notes that defendants make a series of assertions on pages 8 through 11 of their memorandum of law. To the extent not addressed above, the Court notes that it has reviewed the entirety of defendants' memorandum and finds any arguments made by defendants not specifically addressed herein to be without merit at this stage of the litigation.

**IV.     Conclusion**

For the reasons explained herein, defendants' motions to dismiss [Docs. 85, 87, 88] will be **GRANTED IN PART and DENIED IN PART**. Said motions will be granted to the extent they seek dismissal of plaintiff's claims pursuant to 18 U.S.C. § 1962(a) and (b), but denied in all other respects. To the extent defendants have requested dismissal of plaintiff's breach of agreement and breach of fiduciary duty claims on the grounds that dismissal of plaintiff's RICO claims would deprive this Court of subject matter jurisdiction over the state law claims in this case, that request will be **DENIED as moot**.

ORDER ACCORDINGLY.


s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE